# Dixon-Woods Company, Appellant, v. The Phillips Glass Company.

169    167
25 SC °170
169    167
211    24
·169    167
40SC²460

*Contract—Guaranty—Hazard of experiment.*

In a suit on a written agreement under which plaintiff agrees to erect according to plans prepared by it " one continuous melting, regenerative tank melting furnace, with 12 working holes designed to work 36 window glass blowers in three shifts of 12 blowers each per day of twenty-four hours, the furnace to be operated with fuel gas manufactured from coal by what is known as 'Wellman' producers," and " to erect three of said producers and connect same with gas valve of said furnace by flues or conduits of suitable size to convey the gas from producers to valve in sufficient quantity to operate said furnace," and " to erect two additional producers and connect same by flues or conduits of suitable size with two blowing furnaces and three flattening ovens erected or to be erected by second party (defendant), also with floater kiln hereinafter named to be erected by first party " (plaintiff) ; and " first party (plaintiff) guarantees that the work will be done in a thoroughly workmanlike manner and

that all material used will be of the best quality for the purpose required; and further that the gas flues or conduits will have capacity sufficient to supply the various furnaces and ovens named, and, while not guaranteeing absolutely the successful operation of the furnaces, first party (plaintiff) to use every endeavor in its power to make them operate successfully;" it appeared that this method of melting glass and operating the furnace with fuel gas had hardly passed the stage of experiment, and both parties had full knowledge and experience in glass manufacture; it was *held* that the plaintiff was bound to show (1) that the work was done in a thoroughly workmanlike manner, and that the material used was of the best quality for the purpose; (2) that the gas flues had a capacity sufficent to supply the furnaces and ovens; (3) that it had used every endeavor in its power to make them operate successfully; but all the hazard of what was an experiment was to be assumed by defendant, and it may be assumed that plaintiff did not intend to guarantee a successful result, and that defendant did not exact such guaranty.

*Contract—Question for jury—Damages.*

In such case where defendant avers that the " Wellman " producers were not of a size to furnish gas in sufficient quantity, even if the flues were sufficient, and the evidence showed that " Wellman " producers were of different sizes, that the term itself imported no particular size, and that they were often made larger than those supplied by plaintiff, and the evidence of plaintiff did not show that the term " Wellman producer " meant just such a one as it had constructed, the question is for the jury; and if plaintiff did not put in producers of sufficient size according to the plans prepared by itself when it could have done so, it is answerable in damages.

In such a case it was not error for the court to charge " if the Wellman producer is as the defendant claims a producer which may be erected of any size, then an agreement to erect producers as part of a plant to work thirty-six blowers is an agreement to build those producers of sufficient size and capacity to do their part of the work of said plant and plaintiff should have so built them."

*Contract—Parol agreement—Rebuttal—Evidence.*

Where plaintiff offered in evidence the written agreement upon which it relied as a ground of recovery, it was not competent for it to set up a contemporaneous parol agreement in rebuttal of defendant's claim for damages where no fraud or mistake was alleged which would authorize a modification of the writing. The introduction in rebuttal of such new matter was not warranted by the evidence.

In such case it was competent to prove that the tank built and designed by plaintiff had not sufficient capacity for thirty-six men working three shifts per day.

*Contract—Damages.*

In such a case it was not error for the court to charge the jury that " if they found the plaintiff did not perform its contract then defendant was entitled to damages in (1) the amount reasonably and necessarily expended

in completing the contract; (2) the expenses incurred and material lost in attempting to operate the plant so long as it was reasonable to operate it in order to ascertain whether it would operate successfully; (3) the expense incurred necessary to preserve the tank and material in it, while making necessary changes in flues and producers; (4) fair compensation on the testimony for the use of the plant while deprived of its use by failure of plaintiff to fulfill its contract."

*Court-record—Certificate—Errors.*

The records of a court import verity, and therefore it is incumbent upon the judge who certifies to them to see to it under the full authority given by the constitution to all courts, that manifest errors are corrected.

Argued Nov. 8, 1894.    Appeal No. 275, Oct. T., 1894, by plaintiff, from judgment of C. P. No. 3, Allegheny Co., May T., 1892, No. 341, on verdict for plaintiff (less than claim).    Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ.    Affirmed.

Sci. fa. sur mechanic's lien.    Before McCLUNG, J.

At the trial it appeared that the material part of the contract upon which the plaintiff's claim was based was as follows:

"Memorandum of agreement, made and entered into this Fourteenth day of November, A. D. 1890, by and between Dixon-Woods Co., a corporation of Pittsburg, Pa., party of the first part, and Phillips Glass Co., a corporation of the same place, party of the second part,

"Witnesseth, That for the consideration hereinafter mentioned, party of the first part covenants and agrees to erect or build on the site selected by second party at their works, Twentieth and Mary Sts., South Side, Pittsburg, Pa., the following named furnaces and appliances to be used for the manufacture of window glass, viz: One continuous melting regenerative tank melting furnace, with twelve working holes, designed to work thirty-six window glass blowers in three shifts or turns of twelve blowers each, per day of twenty-four hours, working under rules and regulations of American Window Glass Workers Association.    Said furnace to be operated with fuel gas, manufactured from coal by what is known as the 'Wellman' producers.    Furnace to be complete with valves of suitable dimensions, and stack 125' 0" high from bottom of flue.

"First party to erect three of said producers and connect same with gas valve of said furnace by flues or conduits of suitable

size to convey the gas from producers to valve in sufficient quantity to operate said furnace. First party further agrees to erect two additional producers and connect 'same by flues or conduits of suitable size with two blowing furnaces, and three flattening ovens erected or to be erected by second party, also floater kiln hereinafter named to be erected by first party. . . . All to be built according to plans and specifications prepared by first party. . . . First party guarantees that the work will be done in a thoroughly workmanlike manner, and that all material used will be of the best quality for the purpose required, and further that the gas flues or conduits will have capacity sufficient to supply the various furnaces and ovens named, and while not guaranteeing absolutely the successful operation of the furnaces, first party to use every endeavor in their power to make them operate successfully.

"First party further agrees that they will make any re-arrangement or changes to the flues and producers, or anything of that kind found necessary, for the successful operation of the furnaces without further cost to second party than the consideration hereinafter named to be paid by second party. The work contemplated in this contract to be completed in time to commence blowing gas from said furnace not later than Sept. 15, 1891. First party to have the privilege of commencing and completing all portions of the work that can be completed prior to commencing work on the furnace proper or melting and regenerative chambers, viz: producers, boiler, flues, conduits, valves and stack, or any other portions that can be completed while the second party continues to operate the ten-pot melting furnace, now situated on the site to be occupied by the tank melting furnace. Should any delay be caused to the first party in completing said work, by second party failing to comply with the terms of this agreement, or caused by remodeling buildings of second party, or any cause beyond control of first party, the time named for completion of the work to be extended the length of time first party is delayed.

"As a full and complete consideration for the above work and material, second party agrees to pay to first party the sum of Thirty-one Thousand Dollars ($31,000). . . .

"In addition to the above consideration and without diminution thereof, second party agrees to remove the pots from the

ten-pot melting furnace, now located on site proposed for tank furnace, on May 31st, 1891, and put out the fire, giving first party possession of the building June 1st, 1891, for the purpose of performing the work covered by this contract.   Second party agrees further that all material of whatever kind removed by first party from said ten-pot melting furnace, pot arches and sand kiln, their foundations, cave walls and cave to be the property of the first party to use as far as suitable in constructing the new furnace, etc.

"In addition to the above named considerations, second party agrees at their own expense, to furnish and erect the coal platforms and boiler house, and that any repairs of flattening ovens or blow furnaces necessary, except what is necessary to apply the fuel gas as stipulated to be done at expense of second party. . . .

"Second party agrees further to give first party possession of said buildings at the time stipulated, for the performance of the work, and not in any way to delay first party in the performance of said work as above stated, whether by written order or by default of payments of considerations as herein stated." . . .

Defendant offered to prove by C. W. Phillips, a witness on the stand, as follows:

By Mr. Cook: "I propose to show that we provided abundant gas supply; had competent men to use the tank in a proper way, and that as designed it has not sufficient capacity for thirty-six men."

By the Court: "That is competent to show that—to show tests and the result of them."

"Q. Did you put up additional producers so as to produce additional gas supply?   A. Yes, sir; we put up one more. Q. That makes six?   A. Yes, sir.   Q. And connected them with what?   A. With this flue that Mr. Smythe built.   Q. That is the tank flue?   A. The tank flue.   Q. Now, what men did you have in charge—experienced or otherwise?   A. I had Arthur Mattern, the most experienced man that I know of in the United States, in charge of that tank.   Q. Did you have experienced men in charge of the producers?   A. Yes, sir; the very best I knew of.   Q. Did you encounter any difficulty in getting the gas from the producers to that tank?   A. With the new flues?   Q. Yes.   A. No, sir.   Q. Now, under those

conditions, has the tank, as built and designed by the plaintiff, ever shown the capacity to employ thirty-six men working three shifts a day, working under the rules and regulations of the American Glass Workers' Association?"

By Mr. Ferguson : " We object, first, for the reason that there is no guaranty that the tank will furnish the glass sufficient for thirty-six window glass blowers; that the question is whether or not the tank is of the kind that is desired to work that number of blowers—whether it is of the size and design generally used for that number of workmen."

By the Court: " To exclude evidence here would be for the court to undertake to pass upon the question of this design. We think it will afford some light to the jury in determining whether or not the tank furnace contracted for was supplied."

The objection was overruled and a bill sealed for plaintiff. " A. No, sir, it has not shown any such capacity as that. Q. What capacity has it shown under those conditions? A. Twenty-seven to thirty blowers. [2]   Q. Mr. Phillips, did the making of glass, so far as you conducted it with the old flues, result in profit or loss?" Objected to.

By Mr. McCook: " We don't want the amount, only the fact."

By Mr. Ferguson : " We object to that fact as incompetent and irrelevant."

By Mr. McCook: " The purpose is to show that there was no profit made out of the operation, so far as we did conduct it, to be applied to this loss of ours."

By the Court: " If the defendant desires, we will let it put it in." Bill sealed for plaintiff.

" A. Great loss." [4]

By Mr. McCook: " Q. What amount did you expend in employing labor to operate the gas producers between the time when the plaintiff delivered the works to you and the time when you ceased to operate them and substituted the new flue?"

By Mr. Ferguson: " We object, as incompetent and irrelevant, and as not the proper measure of damages."

By the Court: " Objection overruled. Bill of exceptions sealed for plaintiff."

" A. Seven hundred and eight dollars." [5]

C. W. Phillips being on the stand, was asked the following

question by Mr. McCook: "Q. Tell us, Mr. Phillips, the amount of your fixed charges, taxes, insurance and salaries, but not profits or losses, between Sept. 19, 1891, and April 15, 1892, the date when you said you resumed operations with the new flue."

Objected to as incompetent and irrelevant, and not the proper measure of damages.

By Mr. McCook: "We are, of course, not claiming for profits or loss. We are claiming for those dead, continuing expenses that go on at all times for such works as this, and which I have always understood is a proper measure of damages in such a case."

By the Court: "If they were fixed charges of this part of the plant, I understand they had a glass works, and that they were running probably the balance of the glass works. We don't know how much was running, and probably these fixed charges belong to it. With proper limitations the item may possibly go in. The whole matter indicates to me very strongly that it will turn out to be largely incompetent, if we let it go in now."

By Mr. McCook: "We will start with the quantity of fixed charges per month."

By the Court: "We will overrule the objection and seal bill for plaintiff."

"A. That amounts to, $4,307. Q. Now, give us the items, so that the jury can judge? A. Interest on the capital stock for five and a half months, $2,740; taxes, $400; insurance, $490; extra clerk hire, $677; making a total of $4,307." [6]

"Q. In the then state of the market between the time when you began to operate that plant with the Dixon-Woods Company flue, and the time when you began to operate with the Smythe flue, would or would not the value of the glass produced, if it had been merchantable, been such as to cover the cost of the batch and fuel and the labor in producing the glass and the dead expenses that you have referred to?"

By Mr. Ferguson: "We object as incompetent and irrelevant, and further object that the question necessarily involves the element of profits in connection with the testimony already admitted as an element of damages."

By the Court: "We do not understand that there is any rule

which excludes profits if you can get at them. My present impression is that the offer of the defendant is a very conservative one. The objection is overruled and bill sealed for the plaintiff."

" A. Yes, sir; it would have covered it all amply." [7]

" Q. Mr. Phillips, what would have been the fair rental value of the tank department of your works connected with the producers, flattening ovens and other things to be installed under this contract, and of the premises and buildings containing the the same, between Sept. 19, 1891, and March 1, 1892? "

By Mr. Ferguson : " We object to the shape in which it is put as incompetent and irrelevant."

By the Court: " The objection is overruled and bill sealed for plaintiff."

By Mr. Gordon : " Q. You can give it by the month if you want to. A. About $3,000 a month. Q. Now you spoke before about interest on capital; what is the capital stock of your company? A. $150,000. Q. What is your surplus? A. $35,000. [8] Q. What was, in 1891 and the early part of 1892, the fair market value of the property of your company ; of your plant, I mean? "

By Mr. Ferguson: " We object to that as irrelevant."

" By the Court: It is competent, we think, to prove the market value of the portion of the plant that this had to do with, but the question as put is improper, and we will sustain the objection."

By Mr. McCook: " Then I will add this to it: Q. And how much of the value belonged to the tank department and how much to the ten-pot department?

By Mr. Ferguson: " We object to the question as incompetent and irrelevant."

By the Court : " It is one of those things where we will have to control the jury at the proper time. We will overrule the objection and seal a bill for the plaintiff."

Question read with the addition made to it by Mr. McCook.

" A. Well, I would say that of the $150,000—Q. Tell us the market value without regard to capital stock? A. I would say $150,000. Q. For the whole? A. No, sir; for the tank portion of it. [9] Q. Now, when did you let a contract to any other person to complete this work? "

By Mr. Ferguson : " We object for the reason that no demand has ever been made, or is claimed to have been made, upon the Dixon-Woods. Company to make any rearrangement or changes to the flues and producers, or anything of that kind necessary for the successful operation of the furnaces, and that, therefore, they cannot recover for any expense they may have been put to under any arrangement made with any other party in regard to changes."

By the Court: " We think it is competent for the defendant to prove the cost of putting these matters in such shape that the furnace would work ; that is, to prove the cost of changing the flues or other such matters in order that the furnace may be put in successful operation."

" To which ruling of the court counsel for plaintiff except, and at their instance bill sealed." [12]

In rebuttal, plaintiff made the following offers to prove by H. L. Dixon, a witness on the stand, and other witnesses, " that the premises of the Phillips Glass Company, upon which the tank furnace and other structures mentioned in the agreement sued on in this case were to be constructed, were in a narrow and contracted space, and that at the time of making the contract a question of affording room for the materials to be used by the plaintiff came up between the parties, and that the defendant company agreed that they would give storage for such materials as the plaintiffs required in order to enable them expeditiously to perform their work, and that upon the faith of this agreement of the defendant, the plaintiffs agreed as to the date at which the work was to be completed, and that without such agreement upon the part of the defendant they would not have engaged to complete the furnace at the date specified in the agreement in evidence."

This was objected to as irrelevant, incompetent and not rebuttal.

The objection was sustained and bill sealed for plaintiff. [1]

" We propose to prove by the witness on the stand that the only available place for the construction of the flue leading from the producer to the tank on the premises of the defendant was under the buildings, and that the plaintiff located and originally intended to construct the flue under said building ; that the defendant objected to such construction, and directed

the plaintiff to construct the said flue in a public alley running alongside of his premises; that this direction was given after the execution of the contract between the parties; that in constructing the flue in said alley the plaintiffs were delayed in their work because they were exposed to the rains of the season, which were unusually heavy at the time; because the flue had to be erected in shorter sections than it would have been in the place where it was originally intended to construct it; because the progress of the work was interfered with by the use of a track owned by the defendants crossing said alley; because they were compelled to do their work much more slowly in order to not incommode parties abutting upon the alley, other than the defendant, from traveling thereon, and using the same."

This was objected to as irrelevant under the terms of the contract, and also incompetent.

The objection was sustained and bill sealed for plaintiff. [3]

Plaintiff's point and answer which is assigned as error was as follows:

" First. That in the performance of the written contract sued on in this case, the plaintiff was only bound to bring to its performance such skill and knowledge as men ordinarily skilled in the erection and construction of such work possessed at the time said contract was entered into. And that subject to this degree of skill and knowledge, plaintiff had the right to determine the size and construction of the tank melting furnace, and of the Wellman producers, and the size, mode of construction and mode of connection of the flues or conduits to convey the gas from the producers to the melting tank, blowing furnace, flattening ovens and floater kilns, and all other matters relating to the plan or design of the plant to be constructed under said contract, except where specific provisions in relation thereto were set out in the contract. And said plaintiff, further, was only bound to use in the work, material of the best quality for the work required, and do the work in a thoroughly workmanlike manner. That plaintiff was not bound to furnish more than five Wellman producers under the contract, even if it should be found that more than five were required to furnish the necessary amount of gas. And if the jury find that the plaintiff did construct the plant according to its own plans and specifications, and that in the doing of said work and the

designing thereof it had exercised the care and skill which men engaged in that business ordinarily possessed and exercised, then plaintiff is not responsible for the result of the work done, unless the jury find that the flues and producers built or like parts of the work built and furnished by the plaintiff could have been so changed and rearranged as to produce a successful operation of the furnace. *Answer:* That point, as put, is refused. In the first place plaintiff was not only to erect and construct the plant, but was to prepare its plans and specifications; that is, it was to be the architect as well as the building contractor, and its skill and care must extend to its conduct in both capacities. You will recollect that is a criticism upon the portion of the point which refers to its exercising proper care in the erection and construction of its work. That should refer also to the planning of it, or, rather, the preparing of the plans and specifications for it. In the second place, whilst the plaintiff was to build only five Wellman producers, and whilst if those producers are of a fixed size and capacity the point would, in this respect, correctly express the law, defendant maintains that these producers are constructed of all sizes and capacities, and in such cases a contract to supply five producers as part of a plant sufficient to work thirty-six blowers, is a contract to build those furnaces of sufficient size and capacity to do their part of the work of such plant. As I have before said to you, if you find that those producers are of a fixed size and capacity, then the number of them was fixed by the contract, and the plaintiff was only bound to build that number. But if the capacity depended upon the size—that is, if they are built of different sizes and capacities—then the company in contracting to build a certain number for a certain work contracted to build them of sufficient capacity to perform their work. With the qualifications that I have suggested, the point correctly expresses the law. As I have already said, the plaintiff company was not bound to produce perfection in this work, was not bound to bring the highest degree of skill and knowledge to the performance of it, but was bound, ordinarily, to bring to its performance only such skill and knowledge as men ordinarily skilled in such work have and exercise."

Defendant's point and answer, which was assigned as error, was as follows :

" Third. If the jury find from the evidence that the Wellman gas producers were made of different sizes, and could have been made of sufficient size so that three of them would supply the gas required for the tank furnaces, and two of them would supply the gas required by the blowing furnaces and flattening ovens ; and if the jury find that the Wellman producers installed by the Dixon-Woods Company were not of sufficient capacity to do this, and that it was less expensive to add additional producers than to change the ones already there, then they should allow a credit to the Phillips Glass Company for the cost of such necessary additional gas producers. *Answer :* This is affirmed." [10]

Verdict and judgment for plaintiff in the sum of $3,055.08. Plaintiff appealed.

*Errors assigned* were (1–10) rulings on evidence; (11, 12) instructions as above, quoting them.

*John S. Ferguson, P. C. Knox, James H. Reed* and *Edwin W. Smith* with him, for appellant.

*Willis F. McCook, George B. Gordon,* with him for appellee. —Defendant was entitled to compensation for the deprivation of the use of the plant during such time as it was necessarily idle in making the repairs, and this is ordinarily the rental value : Erie City Iron Works v. Barber, 106 Pa. 125 ; Rogers v. Bemus, 69 Pa. 432.   Under circumstances where it may be possible to show with accuracy what the loss of profits was, they may be regarded: Garsed v. Turner, 71 Pa. 56 ; Lentz v. Choteau, 42 Pa. 435 ; McKnight v. Ratcliff, 44 Pa. 169 ; Sedgwick on Damages, section 170.

OPINION BY MR. JUSTICE DEAN, July 18, 1895 :

On the 14th of November, 1890, the parties to this suit entered into a written agreement, by which the plaintiff agreed, for the consideration of $31,000, to erect, according to plans prepared by it, on Twentieth and Mary streets, South Side, Pittsburg, for defendant, " One Continuous Melting Regenerative

Tank Melting Furnace, with twelve working holes, designed to work thirty-six window glass blowers, in three shifts of twelve blowers each per day of twenty-four hours; the furnace to be operated with fuel gas manufactured from coal by what is known as 'Wellman' producers. First party to erect three of said producers, and connect same with gas valve of said furnace by flues or conduits of suitable size to convey the gas from producers to valve in sufficient quantity to operate said furnace. First party further agrees to erect two additional producers, and connect same by flues or conduits of suitable size with two blowing furnaces, and three flattening ovens erected or to be erected by second party, also with floater kiln hereinafter named to be erected by first party." The contract was to be completed not later than 15th of September in the next year; with the proviso, however, that should the work be delayed by failure of defendant to comply with the agreement, or by remodeling its buildings, or by any cause beyond plaintiff's control, the time was to be extended. In addition to the work stipulated for in the written contract, by a verbal agreement between them the plaintiff agreed to erect, on the same premises, a "flattening oven" for $2,125. The written agreement embodied general specifications of the character of the work to be done, and the results to be accomplished.

The plaintiff, claiming it had fully performed its contract, on or about the 1st of December, 1891, filed a mechanic's lien against the premises, on the 18th of March, 1892, claiming a balance due and unpaid on the contract of $11,941.65, with interest from date of completion of work, and issued sci. fa. thereon for judgment; to this, defendant filed affidavit of defense, denying any indebtedness on the contract, and averring that, on the contrary, plaintiff was indebted to it in the sum of $10,366.74, because of damages sustained by reason of plaintiff's nonfulfillment of its contract, both as to design and quality of work done, and failure to finish it within the stipulated time. At the trial, the court below treated the questions in dispute as ones of fact mainly, and submitted the evidence bearing on them to the jury. The verdict was for plaintiff in the sum of $3,055.88, instead of the $11,941.65 claimed, and it now appeals, assigning twelve errors to rulings on admission or rejection of evidence, and charge of the court.

The dispute between the parties arises, principally, because of opposite construction of this paragraph in the contract:

"First party (plaintiff) guarantees that the work will be done in a thoroughly workmanlike manner, and that all material used will be of the best quality for the purpose required, and further, that the gas flues or conduits, will have capacity sufficient to supply the various furnaces and ovens named, and while not guaranteeing absolutely the successful operation of the furnaces, first party to use every endeavor in their power to make them operate successfully."

It will be noticed, the contract was to erect a tank melting furnace designed to work thirty-six blowers in three equal shifts per day; the furnace to be operated with fuel gas manufactured from coal, by what is known as the "Wellman" producer. As necessary to a proper understanding of the contract, a fact clearly established by the decided weight of the evidence should be stated: viz, that this method of melting glass in a tank for blowing, instead of in pots, and operating the furnace with fuel gas, instead of with natural gas, or coal, had hardly passed beyond the stage of experiment; therefore, as both parties had full knowledge and experience in glass manufacture, it may be assumed that the plaintiff did not intend to guarantee, absolutely, a successful result, nor did defendant intend to exact such guaranty. The surroundings of parties at the time of making a contract, and the subject-matter thereof, are always admissible to ascertain their intention, if their expressions be ambiguous or disputable. Having in view this situation of the parties, as an aid to the interpretation of the guaranty clause of the contract, already quoted, we are of opinion, the plaintiff was bound to show :—1. That the work was done in a thoroughly workmanlike manner, and that the material used was of the best quality for the purpose. 2. That the gas flues had a capacity sufficient to supply the furnaces and ovens. 3. That they had used every endeavor in their power to make them operate successfully.

But this was, as to this particular, the full extent of their undertaking; they, by the use of the words, "while not guaranteeing absolutely the successful operation of the furnaces," clearly relieve themselves of any undertaking as to a successful result, even after the three stipulations noticed be fully per-

formed; all the hazard of what was an experiment was to be assumed by the party for whom the work was done, and not by the party who contracted to do it. On this interpretation of the contract, plaintiff offered evidence tending to establish that the work was well done, the material of the best quality, the producers and gas flues were of sufficient capacity, and that they did their best to make the furnaces operate successfully. And if this had been all that appeared in the case, they would have been entitled to a verdict for the balance unpaid on the contract, for they did not undertake that either tank melting or fuel gas should prove a success in glass manufacturing.

But it will be noticed, that plaintiff undertook to furnish three " Wellman " producers for the manufacture of natural gas, and to connect them by flues of suitable size to convey the gas from the producers in sufficient quantity to operate the furnaces. Defendant averred, the producers were not of a size to furnish gas in sufficient quantity, even if the flues were sufficient; and it adduced evidence tending to show that Wellman producers were of different sizes; that the term itself imported no particular size, and they could be, and often were, made larger than those supplied by plaintiff. In reply to this, plaintiff offered evidence, tending to show that the term " Wellman producer " meant just such a one as they had constructed, and certainly did not mean a larger one; probably, as it appears to us, the weight of the evidence was with plaintiff as to this fact; nevertheless, it was a disputed fact for the jury. Plaintiff did not undertake that fuel gas should successfully operate the furnace, but it did undertake, if there were producers and flues of sufficient and insufficient size, then it would use " every endeavor to make the furnaces operate successfully; " and further, that it would make " any re-arrangement or changes to the flues and producers, or anything of that kind, found necessary for the successful operation of the furnaces." If plaintiff did not put in producers of sufficient size according.to plans prepared, which were to be prepared by itself, when it could have done so, it is answerable in damages.

The plaintiff, in undertaking that the work should be done according to plans and specifications prepared by itself, was more than a builder; it was also the architect, and, to a certain extent, the designer of its own work; this fact made it some-

what difficult to define the exact measure of its responsibility; but we think the learned judge of the court below, under this contract, correctly stated the law applicable to the evidence when he said to the jury: "If it is true that a Wellman producer means a producer of a certain size, then defendants could not complain, if three producers were erected, even if they did not produce sufficient gas; or if the producers erected are the largest size of Wellman producers, then they have all they contracted for. But if the Wellman producer is, as the defendant claims, a producer which can be erected of any size, then an agreement to erect producers, as part of a plant to work thirty-six blowers, is an agreement to build those producers of sufficient size and capacity to do their part of the work of said plant, and plaintiff should have so built them."

This interpretation of the contract, was also applicable to the damages claimed, because of improper application of heat to the tank, and a defective construction of the flue; plaintiff was answerable for defective and unworkmanlike construction, but was not answerable for incapacity of a new method or process, or for the unauthorized acts of third persons; the conflicting evidence on these questions was fairly submitted to the jury. This disposes of the tenth and eleventh, appellant's most important assignments of error.

As to the first assignment, appellant offered evidence to prove that defendant, at the time of making the contract, promised plaintiff to provide for it, on the premises, room for storage of certain materials to facilitate performance of the work, and without such promise plaintiff would not have contracted to complete the work by the day mentioned in the agreement. This was objected to by defendant, and excluded by the court.

The agreement expressly provided, that defendant would make ready the buildings, and give plaintiff possession on June 1, 1891, " for the purpose of performing the work covered by this contract." As plaintiff had offered in evidence the written agreement, and relied on it as a ground of recovery, we do not think it was competent to set up a contemporaneous parol agreement in rebuttal of defendant's claim for damages. It was not a failure on part of defendant to perform any part of the written contract, or any act of defendant subsequent to it, not intended by it, but the offer was to prove a failure to

perform another and a parol agreement, made at the same time as the written one; no fraud or mistake was alleged which would authorize a modification of the writing. The introduction in rebuttal of such new matter was not warranted by any rule of evidence.

Second assignment. Defendant offered evidence to show, the tank as built and designed by plaintiff had not sufficient capacity for thirty-six men working three shifts per day. It was objected to, for the reason that plaintiff did not guarantee it would have such capacity. In the construction put upon the contract, in discussing the tenth and eleventh assignments of error, this was admissible. It was not competent for defendant to prove that melting glass in a tank was not a success, but it was competent to prove that this tank was not large enough for three shifts every twenty-four hours, even if the new method would otherwise have been successful.

As to the third assignment, on reading the evidence it plainly appears the offer by plaintiff was admitted; noting " objection sustained," was an error of the reporter, which is shown by the fact that the witness did testify to all the facts proposed to be proved; besides, the course of cross-examination by defendant's counsel indicates that he had testified in support of the offer. The court below ought to have had this error corrected before certifying the record; if the records of a court import verity, then it is incumbent on him who certifies to them to see to it, under the full authority given by the constitution to all courts, that manifest errors are corrected.

The twelfth assignment complains of the admission of testimony as to the cost of rearranging and changing flues, which defendant alleged were badly located and defectively constructed.

As we have already noticed, by the contract, plaintiff stipulated that: "It would make any re-arrangement or changes to the flues and producers, or anything of that kind found necessary for the successful operation of the furnaces, without further cost" to defendant.

Notice to plaintiff, and opportunity to make the change, are implied, before it could be charged with the cost of such change. There was ample evidence of precedent notice to plaintiff to remedy the alleged defects in the construction of this, and other

parts of the work; it did not believe the contract imposed upon it such obligation, and refused to do so. Whether the change was such as warranted defendant in charging the plaintiff with the cost of it, depended on the finding of the jury as to the fact of defective construction. It was material, therefore, to defendant to prove when the contract to remedy the defect had been made, if for no other reason than to show the expenditure was subsequent to the notice. There was no error in the admission of the evidence.

All the other assignments relate to the instruction of the court as to the measure of damages, and the admission of evidence relating thereto. The peculiarity of the contract made it difficult to distinguish whether success in operation failed because of defective performance by plaintiff of its contract, as designer and builder, or because of the adoption of new methods; the same peculiarity, also, made the rules determining the measure of damages somewhat difficult of application to the conflicting evidence. The learned court instructed the jury, if they found plaintiff had not performed its contract, then defendant was entitled to damages in: 1. The amount reasonably and necessarily expended in completing the contract. 2. The expense incurred and material lost, in attempting to operate the plant, so long as it was reasonable to operate it, in order to ascertain whether it would operate successfully. 3. The expense incurred, necessary to preserve the tank and material in it, while making necessary changes in flues and producers. 4. Fair compensation, on the testimony, for the use of the plant while deprived of its use by failure of plaintiff to fulfil its contract.

This was followed, again, by the caution, that if plaintiff had used due skill in its work, but experience demonstrated that the method was at fault, then defendant must bear the loss; that distinction must be made between care and skill and experiment. As is said in McKnight v. Ratcliff, 44 Pa. 156 : " It is often much easier to discover when an assumed rule for damages will lead to erroneous results, than to point out in all cases, in advance, what the true rule should be." Logically, the rule laid down by the learned judge would possibly lead to an estimate of what profits might have been made while defendant was deprived of the use of its plant. But it did not lead to that result, for he properly controlled the admission and effect

of the evidence so as to exclude any estimate based on what speculative profits defendant might have made, and confined the estimate to the actual loss.    The court very plainly said to the jury, they were to ascertain " How much it was worth as a plant to a man desiring to use it; how much rent would he pay for it? . . . . As I have explained to you, these other items that were admitted in evidence, will not be taken into account as a measure of damages.    They are only for the purpose of aiding you to get at the value of the plant; that is, the rental value during the time of the delay."

While fair compensation for the use of the plant when idle would, theoretically, be reimbursement for loss of profits, yet the impossibility of determining the amount of profits in this case, as in nearly every case of like character, was recognized by the court; such estimate would have been purely speculative as to what, under the most favorable circumstances, might have been made; therefore, the consideration of the jury was limited strictly to what would have been a fair rental value: Sedgwick on Damages, sec. 170.    And on this question, all the evidence complained of had a bearing, and there was no error in not excluding it.

A careful examination of the more than 400 pages of testimony, with the many rulings on objections thereto, as well as a consideration of the very full and clear charge of the court, leads us to the conclusion no error warranting a reversal of the judgment was committed.

The judgment is therefore affirmed.